57 CCPA

## Application of Theodore S. BINDSHEDLER.

### Patent Appeal No. 8289.

United States Court of Customs and Patent Appeals.

June 25, 1970.

Raymond E. Fidler, Edmond T. Patnaude, Fidler, Bradley & Patnaude, Chicago, Ill., attorneys of record, for appellant.

Joseph Schimmel, Washington, D. C., for the Commissioner of Patents. Fred W. Sherling, Washington, D. C., of counsel.

Before RICH, Acting Chief Judge, ALMOND, BALDWIN and LANE, Judges, and ROSENSTEIN, Judge, United States Customs Court, sitting by designation.

RICH, Acting Chief Judge.

This appeal is from the decision of the Patent Office Board of Appeals [1] affirming the rejection of claims 1–9, 14–16, and 42–49 [2] of application serial No. 285,550, filed May 31, 1963, and entitled "Data-Records, and Data-Recording and Utilizing Methods and Means." [3] Claims 17–31 have been allowed.

### The Invention

The broadest claims on appeal are directed to a method and apparatus for converting data into electric signals by printing characters or symbols representative of the data with magnetic ink on a non-magnetic record member and thereafter automatically sensing or reading the printed data by electromagnetic means. Some of the claims include the steps of printing the characters with a "hard" magnetic ink and permanently magnetizing the characters in a particular direction before they are read with a magnetic sensing head. Other claims are directed to apparatus which utilizes these methods to enter data into an accounting machine.

1. Consisting of Kreek, Keely, and Strader, Examiners-in-Chief, opinion by Keely.

2. Originally, appellant also appealed from the board's affirmance of the rejection of claims 10, 11, and 37–40. At oral argument, however, appellant's attorney stated that the appeal would not be pursued as to these claims.

3. This application is stated to be "a division of application serial number 576,475 filed April 5, 1956 which, in turn, is a continuation of application serial number 237,241 filed July 17, 1951."

Figs. 1 and 4 of appellant's drawings will suffice to explain the disclosed embodiments:

Fig. 1 shows an accounting machine embodying appellant's invention, while Fig. 4 shows in more detail the construction of pick-up head 15 shown in Fig. 1 and its association with record form 10. The record form 10 has imprinted thereon a line of arabic numerals 11 and a line of printed data representations 12 which are shown in the form of groups of laterally spaced, short, parallel lines, the number of lines in each group being equal to the value of the numeral with which it is associated. The representations 12 are formed of a magnetic ink consisting of a large proportion of finely divided magnetic material such as high

permeability iron, steel, or magnetic alloys, uniformly dispersed in a carrier which may be of the nature of viscous fluid carriers commonly used in known typewriter ribbon inks. Whether numerals 11 are printed with the same magnetic ink or are printed with ordinary typewriter ribbon ink is immaterial since only representations 12 are adapted and intended to be read automatically during movement of the record 10 past the pick-up head 15.

The powdered magnetic material of which the data representations 12 are formed may be magnetically "hard" (not easily demagnetized) or magnetically "soft" (easily demagnetized).[4] When the representations are of "hard" material, they are preferably magnetized transversely to the lengths of the line elements (parallel to line of representations) after being deposited but before being read. If the representations are composed of "soft" material, they are not magnetized prior to being read. The construction details of the pick-up head 15 will depend upon the type of magnetic material of which the representations to be read are composed.

Reading of the data is accomplished by moving record 10 relative to pick-up head 15 in such a manner as to maintain the vertical line elements of the representations 12 parallel to the air gap 21 while transporting those line elements successively past the gap. In the case of unmagnetized data representations, the

reluctance (the opposition presented to magnetic flux in a magnetic circuit) of the magnetic circuit of the pick-up head, which resides principally in the gap 21,[5] is very substantially reduced each time the gap is bridged by one of the line elements (which is more permeable to, i. e., is a better conductor of, magnetic flux than is air) and returns to its normal value as the element is displaced from the gap. Thus, as each line element passes the air gap it causes a change in the magnetic flux produced in the core of the pick-up head by the magnetized segment 18 and induces varying voltages in windings 19 and 20. When the line elements are formed of "hard" magnetic material and are magnetized transversely to their lengths prior to their being read, each element constitutes an individual magnet which produces flux changes in the core of the pick-up head (which need not include a magnetized segment 18) as it bridges or substantially bridges the gap and a cycle or pulse of alternating voltage is induced in windings 19 and 20.

The output of the pick-up head is led over conductors 32 to an amplifier 33 which is in turn connected, through conductors 34 and 47, to accumulating and registering mechanisms not shown in Figs. 1 and 4. It is unnecessary to describe these mechanisms beyond stating that each amplified pulse causes the appropriate electromagnetically energized accumulator to be advanced by a value of one.

---

4. Appellant's application indicates that materials which are magnetically hard have "high values of coercivity and remanence" while those which are soft are "of low coercivity." J. Markus, Electronics and Nucleonics Dictionary (McGraw-Hill 1966) provides the following definitions:
   *coercive force* The magnetizing force required to bring the flux density to zero in a magnetic material that has been magnetized alternately by equal and opposite magnetizing forces. It is the reverse magnetizing force needed to remove the residual magnetism.
   *coercivity* The property of a magnetic material that is measured by the coer-

cive force corresponding to the saturation induction for the material.
   *remanence* The magnetic flux density that remains in a magnetic circuit after the removal of an applied magnetomotive force. If the magnetic circuit has an air gap, the remanence will be less than the residual flux density.

5. The reluctance of the air in the gap is very high compared, for example, to that of the materials comprising the rest of the magnetic circuit of the head. Stated differently, the air is a very poor conductor of magnetic flux, i. e., is of low permeability.

Utilization of the disclosed accounting machine, for example to maintain bank accounts, involves placing the record form 10 into the carriage 25, tabulating the carriage so that the existing balance appearing in the "Balance" column of the form passes by the pick-up head 15 and is thereby read into the machine, printing (by typing on a keyboard, not shown) new entries in the "Item" column (these being entered into the registering mechanism as they are printed, i. e., they need not pass by the pick-up head), and causing the machine to total the old balance and new entries and print the result in the "Balance" column.

## The Rejections

The board reversed seven of the eight rejections applied by the examiner, cited eight references in addition to the five relied on by the examiner, and applied five new grounds of rejection under 35 U.S.C. § 103.[6]

The references relied on by the examiner are:

| | | |
|---|---|---|
| Tauschek | 1,933,352 | Oct. 31, 1933 |
| Bryce I | 2,254,933 | Sept. 2, 1941 |
| Hofgaard | 2,337,553 | Dec. 28, 1943 |
| Peterson | 2,608,621 | Aug. 26, 1952 |
| | | (filed Oct. 8, 1949) |
| Broido (Great Britain) | 538,016 | July 17, 1941 |

The references added by the Board of Appeals are:

| | | |
|---|---|---|
| Huebner | 1,820,194 | Aug. 25, 1931 |
| Knutsen | 2,508,953 | May 23, 1950 |
| Brand | 2,209,106 | July 23, 1940 |
| Hay | 2,035,475 | Mar. 31, 1936 |
| Kitsee | 1,097,131 | May 19, 1914 |
| Clark | 2,188,650 | Jan. 30, 1940 |
| Bryce II | 2,427,383 | Sept. 16, 1947 |

S. J. Begun, *Magnetic Recording*, pp. 49–53, 76–80, 87–91, 97–99, 108–118 and 133–134 (1949).

◆

■ The examiner's rejection affirmed by the board was directed to claim 49 "as unpatentable over Peterson in view of Broido." With respect to this rejection the board said:

Appellant has asserted in his brief that no art has been cited against this claim, and in his reply brief he has not challenged the rejection of this claim on the prior art. Under these circumstances we are constrained to sustain the rejection of this claim.

Although before us appellant argues the merits of the rejection over Peterson in view of Broido, he does not dispute the accuracy of the board's statement or its justification of the affirmance of the rejection. We therefore are likewise constrained to affirm the rejection of claim 49 although we hereinafter also

6. Appellant was given an opportunity to have further prosecution before the examiner, under the provisions of Rule 196 (b), in response to these new rejections but chose instead, as he was free to do, to appeal directly to this court.

sustain a further rejection of that claim by the board.

| Claims | Rejection |
|---|---|
| (1) 1–6, 9, 14–16, and 44–49 | Obvious in view of Knutsen and Begun |
| (2) 1–9, 14–16, and 43–49 | Obvious modification of Hofgaard, Broido, or Brand in view of Knutsen and Huebner |
| (3) 16, 48, and 49 | Obvious modification of Clark |
| (4) 44–47 | Readable on Knutsen, Huebner or Hay |
| (5) 42 | Made obvious by Tauschek, Bryce I, or Bryce II in view of Knutsen.[7] |

It will be noted that all the claims, except 7, 8, and 42, are rejected on either two or three *main* combinations of references. Rather than treat the rejections seriatim, we think it expedient merely to point out which of the combinations of references *relied on by the board* most clearly supports the rejection of a given claim or group of claims.

The best rejections, in our opinion, are those based on Knutsen, Begun, Broido, Heubner, Tauschek, and Bryce I. Knutsen discloses an alleged improvement of perforated data cards wherein the data is recorded by machine or by hand[8] in the form of opaque lines readable by a photocell, electrically conductive ink readable by electric contacts, or *magnetic material* readable by suitable means not disclosed. Fig. 6 from Knutsen shows a perforable card having an area E reserved for recording data with one of the three types of material:

KNUTSEN

*Fig. 6*

[A2045]

The column and row in which a mark appears determines the value which it

---

7. The solicitor believes that all these rejections could be (and implicitly "should be") "summarized and treated as a rejection under 35 U.S.C. § 103 of all the appealed claims over Broido in view of Knutsen, Begun and Bryce I," a rejection not to be found anywhere in the record. We decline to so summarize and so treat these references.

8. Knutsen prefers to mark on the cards "by hand [using a suitable pencil] without resorting to a machine."

represents, the row determining the digit and the column determining whether that digit is in the one's, ten's, hundred's, etc., place.

Begun discloses various types of magnetic pickups, including appellant's type utilizing an air gap in an otherwise closed core, and describes how magnetic flux lines emanating from a magnetized record medium generate voltage changes in the pickup as the medium is moved past it. Begun also indicates that magnetization may be effected either in or transverse to the direction the medium moves and that powdered magnetic materials to be applied to non-magnetic base materials such as paper should have high coercivity and remanence values.

Broido discloses data records readable by automatic light-controlled reading mechanisms associated with "adding and tabulating machines, counters, cash registers and other statistical machines." Fig. 2 from the patent illustrates one form that these data records may take and Fig. 3 illustrates a numeral type that can be used to produce such records:

BROIDO

Fig. 2.

Fig. 3.

Describing how such a record can be printed, Broido states:

The symbols according to the invention may be incorporated in the numeral type of an ordinary typewriter, being then located adjacent the relevant numerals and occupying a position laterally of the space provided for the type head of the lever such as to identify the symbol with the particular value of the numeral carried on said lever. In order to achieve this, the width of the area occupied by each type head is assumed to be divided into ten equal sub-divisions. With this arrangement, in the case of numeral "0" the associated rectangular type block may be in one of the end sub-divisions of the type head and the rectangular type block associated with the numeral "9" may be located in the other end sub-division of the area reserved for the type head of the lever on which it is mounted, the symbols representing the intermediate numerals being located in the corresponding intermediate sub-divisions of the area reserved for the respective type heads. Values of 10 and over will be represented by *two or more symbols* as is usual with the ordinary numerals. [Emphasis added.]

The value represented by a particular mark thus depends on its lateral position within a given area in a line of such areas. Broido contrasts this "single-dimensional" coding arrangement with "bi-directional" arrangements such as that used by Knutsen, and indicates that his (Broido's) basic code can be modified such that the numerical values are *"represented by more than one code character,* for example in the manner known in the art of statistical records as a four or five point code" (emphasis added).

Huebner discloses a method and apparatus whereby printing is effected by transference of ink from a printing surface to a receiving surface without contact between the two. The ink contains magnetizable metallic substances, and transference of the ink from one surface to the other is accomplished by subjecting the surfaces to a magnetic field.

Tauschek relates to devices for reading perforated cards, the devices being adapted to be used in connection with tabulat-

ing mechanisms. At the outset the patent states:

> For the device forming the subject matter of the invention it does not matter whether the statements are arranged in the card in such a manner that the *number of holes following each other in a vertical row corresponds to the digit value of the number to be represented,* or whether the number is represented by a single hole or a plurality of holes provided at a certain place of the line to be sensed. [Emphasis added.]

Tauschek thus teaches the same relationship between the number of marks and the digit represented thereby as does appellant, the only difference being in the nature of the marks—holes in Tauschek and magnetic ink in appellant's case.

Bryce I, relied upon by the board only with respect to claim 42, appears to us to be a particularly pertinent reference, relating as it does to

> * * * a system in which the control elements or records are provided with *magnetic conditions representing various characterizations and data,* and are adapted to be presented to a machine to convert the magnetic conditions on the control elements into *electrical currents or impulses* to control the machine in accordance with the magnetic indications. [Emphasis added.]

The reference continues:

> The specific type of *accounting system* described herein comprises a system wherein the machine control elements are controlled at differential times by the electrical energy generated by the control system by sensing *the coded or differentially positioned magnetic conditions* disposed under control records.

> ✳     ✳     ✳     ✳     ✳     ✳

> The process of magnetically recording data in the form of discrete magnetic conditions or impressions depends essentially on the phenomenon of magnetic hysteresis and on the associated property that when changes of magnetomotive force are made upon a magnetizable substance a certain remanent flux density is retained by the magnetized substance which is termed "remanence." * * *

> The remanent flux densities retained by the control records may then be effective at a subsequent period to *initiate electrical current conditions or impulses* which are impressed upon various control circuits to control the operation of the different machines of the present system. [Emphasis added.]

Bryce I discloses means for recording, reading, and obliterating the magnetic impressions, a system for amplifying the output from the reading means, accumulating and printing mechanisms actuated by the amplified current impulses, and several different embodiments of data records. One such record is shown in Figs. 8 and 9:

FIG.8.          BRYCE I          FIG.9.

[A2047]

One of two plies of paper stock 26 has applied thereto "individual *magnetizable portions* 27" (emphasis added) which "may be *printed* thereon similarly as ordinary printed matter" (emphasis added). In this embodiment, the plies of stock 26 are then secured together by an adhesive 28. It is apparent from the patent that the magnetizable portions are imbedded between the two plies only because this protects them from abrasion during handling and provides a more durable construction than would exist if the portions were merely deposited on the surface of a single ply. To record data on a card of the type shown in Figs. 8 and 9, the portions 27 are selectively magnetized according to the desired coding arrangement. In another data record embodiment, a similarly shaped card has essentially its entire surface coated with magnetizable material, statistical information or data being arranged thereon in the form of "arbitrary [magnetic] indications coded according to their positions on the record." In either of the above-mentioned embodiments, the "magnetizable material * * * may be in the form of metal powder or filings suitably fixed upon a carrier" which is "preferably non-magnetic."

Describing the principle of operation of the tabulating mechanism, Bryce I states:

> * * * records having discrete magnetic impressions representing the data are presented to suitable reading magnets and the said impressions are detected while the records are in motion to initiate timed impulses in accordance with the disposition of the impressions on the record to control either *data accumulating mechanism or data printing mechanism or both* * * *. [Emphasis added.]

### Claims 1–6, 14–16, and 45–49

◾ The rejection of these claims as unpatentable over Knutsen and Begun is sound. Claims 1–6, 14, 15, and 49 are

directed to methods, 16 and 48 to apparatus, and 45–47 to data records. More specifically, claims 1–6 and 49 are drawn to a method of recording and reading data wherein deposits of magnetic material are affixed to (or, as in claims 1 and 4, written on) a sheet of non-magnetic material [9] in a configuration recognizable by a human being as indicative of the data represented thereby, the configurations are magnetized in a predetermined direction, and each configuration is passed by the air gap of a magnetic reading head to produce in the reading head "electric wave shapes characteristic of" claim 1), or a "voltage having a waveform representative of" (claim 4), or "a flux proportional to" (claims 5 and 6) the configuration of the deposit. Claims 4 and 6 also require the provision of means for identifying each configuration according to the voltage waveform induced, while claims 5 and 6 require that the magnetic material have "a high value of coercivity and a high value of remanence." Claim 4 is representative of the method claims:

> 4. A method of recording data for both visual and magnetic reading thereof, comprising
>
> writing on the surface of a non-magnetic sheet a distribution of finely divided magnetic particles,
>
> said distribution having a configuration recognizable by human beings as being indicative of the data represented thereby,
>
> magnetizing said entire distribution of particles to establish in said distribution magnetic lines of force lying parallel to a predetermined direction,
>
> thereafter passing said sheet relative to the air gap of a magnetic reading head to cause relative movement of said distribution in proximity to said air gap, the dimension of said air gap between the poles thereof extending parallel to said predetermined direction during the relative movement between said distribution of magnetic

---

9. Claim 1 does not indicate the type of material on which the deposits are affixed and claim 49 does not positively recite the step of affixing the magnetic material to the sheet.

particles and said reading head to induce in said reading head a voltage having a waveform representative of the configuration of said distribution of particles on said sheet,

and providing means responsive to said voltage for identifying each character in accordance with the waveform of the voltage induced thereby in said reading head.

Claim 14 is similar but specifies that the line of magnetic characters be *printed,* that magnetization of the characters be done parallel to the line, and that flux produced in the reading head be utilized to control entry of the represented data into a machine. Claim 15 is also similar to claim 4, but, instead of the means-for-identifying clause, c o n c l u d e s with "whereby to provide a plurality of electric signals representative of said data."

Claims 16 and 48 are drawn to apparatus for reading a line of magnetic ink deposits. The apparatus includes an air-gap type of magnetic reading head, means for moving the deposits past the air gap, means for producing output voltages related to changes in magnetic flux across the gap, and means responsive to time-displaced portions of the voltage waveforms so produced in the magnetic head. Claim 16 is representative:

16. Apparatus for electrical recognition of each of a plurality of different characters written on a document as a distribution of magnetic ink and arranged in a single line spaced apart from one another comprising, in combination, a magnetic read head having a pair of opposed magnetic pole faces defining an air gap therebetween and further having means for producing an output voltage of a value related to the change in magnetic flux across the air gap, said air gap having a narrow first dimension representing the space separating the pole faces and an elongated second dimension extending at right angles to the first dimension, means for causing relative movement between a document bearing a line of such characters and said magnetic read head to cause movement of said line

of characters past said air gap character with the narrow first dimension of the air gap extending in the general direction of the line of characters and with the elongated second dimension of the air gap extending in a direction substantially parallel to the height of said characters thereby to provide a progressive scan of each character in the direction of said line, said magnetic head being responsive to the magnetic characteristic of the ink of which said characters are formed and to the relative movement of each character past the air gap thereof to cause the output voltage producing means of the magnetic head to produce a unique output voltage waveform for each character scanned, and means electrically connected to said magnetic head for receiving said output waveforms and responsive to time displaced portions of said waveforms for identifying each character read.

Claims 45–47 are drawn to data records. Claim 45 recites a non-magnetic sheet having thereon "data-significant groups" of discrete masses of ferromagnetic material of high permeability. Claim 46 calls for "data-bit representations" each being formed of a discrete "individually magnetically sensable mass of ferromagnetic material of relatively high permeability," while claim 47 just calls for groups of short parallel lines formed of ferromagnetic material of relatively high permeability. These claims do not specify that the material is magnetized.

With respect to the rejection based on Knutsen and Begun, the board said:

[Knutsen] writes with a pencil having magnetic properties * * * on a tabulating card. The writing is adapted to be read and recognized by the human eye of one skilled in the art in the same sense as appellant's characters 12 are read and recognized by the routineer.

Knutsen's preferred mode of sensing is a photo electric or conductive form. However, he recognizes that the other forms of marking require different means of sensing * * *.

*Magnetic records, their characteristics, the various directions of recording and the type of pickups \* \* \* were well known in the magnetic recording field prior to appellant's entry into the field* and would be known and available to the routineer prior to the filing date of the present case.

No patentable significance is attached to the manipulative step of magnetizing the magnetizable material of Knutsen. If this material is not magnetized at the time it is deposited on the tabulating card by the user's pencil, or by the earth's magnetic field then it will be magnetized by the pickup head when the character is sensed during playback or reproduction. [Emphasis ours.]

Appellant's first main contention is based on the observation that neither of these references (Knutsen and Begun) teaches the *magnetization* of *discrete,* magnetic deposits. We are not impressed by the board's statement that the deposited magnetic material, if not previously magnetized, would be magnetized by the reading head, since a number of these claims recite the reading step as taking place *after* the magnetizing step. Neither do we find any reason to think that any magnetization that might incidentally be provided by the earth's magnetic field would be of any operative significance. Nevertheless we are of the opinion that one skilled in the art surely would have considered the recited magnetization step obvious. We note in this regard that appellant has not disputed the following statement by the board:

It is well known in magnetic recording and reproducing that a signal may be obtained from a magnetic material by (1) magnetizing the material and later drawing it under a conductor since this is a well known principle of an electric generator or (2) by drawing a magnetized ferromagnetic material into the gap of a pole piece which results in changing the reluctance of a magnetic circuit which in turn causes

a change in voltage in a coil. Both procedures have been used in the recording and reproducing art.

Given this, and Knutsen's concept of using discrete deposits of magnetic material on data records, we think that one skilled in the art would have recognized immediately that the magnetic material when magnetized would induce signals of greater amplitude in a reading head than when unmagnetized.[10] Adding Begun's teaching of magnetization in a single selected direction, we are of the opinion that one skilled in the art would likewise consider it obvious to magnetize uniformly in one direction (particularly along a line of short parallel lines when using an air gap reading head situated as in appellant's Fig. 4, supra), in order to further enhance the signals induced. Begun's teaching of the desirability of high coercivity and remanence values in powdered magnetic materials would also, in our opinion, render obvious the corresponding limitations in claims 5 and 6.

Appellant's other main contention with respect to this rejection is that the references "fail to teach the use of magnetic deposits shaped to represent data." Specifically, he says this is true as to Knutsen because the "location of [the] marks on the card has data significance— not [the] configurations" and because the marks "are all identical in configuration." As for Begun, appellant says that "nowhere is there any suggestion that data significant electric waveforms might be developed from magnetic deposits having data significant geometrical configurations."

Although appellant has consistently referred to the groups of short parallel lines in his disclosed embodiment[11] as "characters," we are not persuaded that appellant's markings, in the final analysis, are any more "data significant" or "differently configured" than are those of Knutsen. In appellant's embodiment, it is apparent that each of the parallel marks, even though it may be grouped with one or more others, represents one

---

10. The "enhancement of the signal level" is one result that appellant attributes to the magnetization step.

11. All the claims are clearly intended to encompass this embodiment.

item of data, that the significance of a given mark is determined by its being located within a particular area of a line on the record form (the location of that area determining whether a one's, ten's, hundred's, etc., accumulator will be actuated by each mark therein, that each mark has an independent effect on the tabulating equipment (each causing an accumulator to be advanced by a value of "1"), and that, even though groups of marks (each group of marks being a "character") produce groups of voltage pulses (each group of pulses being a "voltage waveform"), the disclosed reading and tabulating equipment is actuated only by the individual marks and impulses induced thereby and does not in any way recognize or discriminate between the various characters or waveforms. Thus, whereas in Knutsen's record the significance of a given mark is determined by the column and row in which it is located,[12] in appellant's record, the significance of a mark is determined by its being located in a particular area (or "column") of a line.[13] Also, it is apparent that, so long as the marks are sufficiently separated so that each induces a distinct signal in the reading head, the spacing of the marks within a particular area, and consequently the "configuration" of the groups of marks or characters, is unimportant to appellant's disclosed invention. We are not persuaded that appellant's use of a number of marks which corresponds to the digit represented renders these claims patentable.

Although appellant does not so argue as to the rejection over Knutsen and Begun, he does argue elsewhere that Knutsen's data record is not "visually readable." We disagree inasmuch as anyone familiar with the coding scheme used by Knutsen obviously could decipher the information on the record by mere inspection.

Not being convinced by any of appellant's arguments regarding the rejection of claims 1–6, 14–16, and 45–49, we af-firm the decision of the board as to these claims.

### Claims 7–9, 43, and 44

Claims 7–9 are directed to systems for "recording and reading characters" and claims 43 and 44 to methods of producing data records. Claims 7 and 9 recite means for printing (claim 7) or depositing (claim 9) differently shaped distributions of magnetic material on a non-magnetic record, means for causing relative movement between the record and the printing means, a magnetic reading head having an air gap, means for moving the record relative to the air gap so that voltage waveforms are induced in the reading head, and means for identifying the distributions by the waveforms. Claim 8, which is dependent on claim 7, specifies that the magnetic material has high coercivity and remanence values and is permanently magnetized.

Claim 43 is drawn to a method of forming a magnetically readable record on a non-magnetic record member by supporting the record member on the platen of a printing business machine having printing types for printing groups of spaced parallel lines and having an inking ribbon bearing a ferromagnetic composition and operating the printing types to press the inking ribbon against the record member. Claim 44 recites a method of producing magnetic records by printing groups of lines containing ferromagnetic material on a non-magnetic record medium.

We affirm the rejection of these five claims on Broido in view of Knutsen and Huebner. Treating claims 43 and 44 first, we have pointed out above why, in our opinion, Knutsen renders obvious appellant's data record and method of transforming data. Adding Broido's disclosure of incorporating into an ordinary typewriter the numeral type in his Fig. 3, supra, we find the methods of forming data records recited in claims 43 and 44 to be equally obvious.

---

12. The column determines whether it is in the one's, ten's, hundred's, etc., place and the row determines the digit represented.

13. The area determines whether it is in the one's, ten's, hundred's, etc., place and the number of marks in that area determines the digit represented.

As for claims 7–9, we have pointed out in our discussion of the first group of claims why it would be obvious in view of Knutsen and admitted knowledge of the art to magnetize the magnetic characters before reading them, why it would be obvious to use an air-gap type of reading head to detect or read such characters, and why we are not impressed by appellant's arguments about differently configured characters and waveforms. Our conviction on the last point is strengthened by Broido's disclosure of coding arrangements in which short, parallel marks are located in particular areas of a line, the positioning of one or more marks within a given area determining the digit represented and the location of that area within the line determining whether that digit is in the one's, ten's, hundred's, etc., place. The only difference then between the coding arrangements of Broido and appellant is that, respectively, the *position* of the marks and the *number* of marks within one of the mentioned areas are significant. We do not see that this difference lends patentability to the claim. Since both Broido and Huebner teach means satisfying the printing means recitation in claims 7–9 and the former teaches means for moving a *record* relative to the printing means, and since we see nothing unobvious in combining these old features into one system, we affirm the rejection of claims 7–9, 43, and 44 over Broido in view of Knutsen and Huebner.

### Claim 42

This claim, drawn to a "bookkeeping" machine, reads as follows:

42. In a bookkeeping machine using cards having record means adapted to have magnetic recordings thereon corresponding to different characters, in combination pickup means for successively sensing magnetic recordings on said record carrier means and for producing electric signals having predetermined characteristics associated with the respective sensed recordings, data storage means adapted to store information represented by said recordings, marking means having a plurality of said characters thereon and being movable between a plurality of positions, said marking means being adapted to mark on the card, in each of said positions, one of the characters represented by a recording on said record carrier means, selectively responsive means connected to said pickup means and selectively responsive to said electric signals produced thereby, and operating means controlled by said selectively responsive means for entering information into said data storage means in accordance with the predetermined characteristics of the respective signals and for subsequently moving said marking means between its positions in accordance with the information in said data storage means, whereby information is entered in said data storage means and a character may be marked on said card, said information and said character corresponding to the recording on the record carrier means.

The two rejections of this claim on Tauschek in view of Knutsen and on Bryce I in view of Knutsen are both sound, the latter in our opinion being the sounder and the one we will discuss. The board opined that it would have been obvious to use Knutsen's type of magnetic card to control the device of Bryce I. We agree.

Appellant's only argument as to this rejection is that Bryce I "lacks any means for recording information from the storage means back onto the record card." Bryce I discloses means for printing information recorded on the data cards, indicates that the magnetic deposits can be printed on the cards, and indicates that (in addition to magnetically recorded data) written, printed, and typewritten data can be placed on his cards. Inasmuch as Knutsen discloses that the magnetic marks on his cards can be applied by machine, we think it would have been obvious to adapt the Bryce I apparatus so that information from the accumulating mechanism or storage could be recorded back onto the record cards.

The decision of the board is affirmed.

Affirmed.